IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| RAMONA GAYLE WILSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:12-CV-130 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**
**TO AFFIRM THE DECISION OF THE COMMISSIONER**

Plaintiff RAMONA G. WILSON brings this cause of action pursuant to 42 U.S.C. §

405(g), seeking review of a final decision of defendant CAROLYN W. COLVIN, Acting

Commissioner of Social Security (Commissioner), denying plaintiff's application for disability

insurance benefits. Both parties have filed briefs in this cause. For the reasons hereinafter

expressed, the undersigned United States Magistrate Judge recommends the Commissioner's

decision finding plaintiff not disabled and not entitled to benefits be AFFIRMED.

I.
INTRODUCTION

Plaintiff alleged she became disabled and unable to work on March 9, 1984. Prior

applications for disability benefits were denied January 2000 and May 2000. (Tr. 24). Plaintiff

was last insured for disability benefits on March 31, 2000. (Tr. 224). Therefore, the relevant

time period in this case was March 9, 1984, plaintiff's alleged onset date, to March 31, 2000, her

date last insured (DLI).

## II.
## THE RECORD

In this proceeding, plaintiff raises, *inter alia*, an allegation that the ALJ's finding that plaintiff did not have a medically determinable *mental* impairment prior to her DLI was not supported by substantial evidence.  Plaintiff does not challenge the ALJ's findings that her *physical* impairments were not disabling other than alleging an error of law in not appointing counsel.  Plaintiff also alleges the ALJ erred in complying with his various duties to plaintiff because his duties were enhanced since he was aware of her mental impairment at the time of the hearing.  Consequently, recitations of the record are limited to those records containing entries regarding plaintiff's mental condition.

On August 20, 1999, a date prior to plaintiff's DLI, plaintiff presented to Dr. Spann at Capital Orthopaedics Spine & Sports for a consultative exam with regard to a claim filed with the Texas Workers Compensation Agency.  (Tr. 344).  Plaintiff had complaints of "primarily left hip pain."  Plaintiff related that her "initial pain began on January 14, 1993 as a result of an on-the-job injury when the vehicle in which she was riding was rear ended."  Dr. Spann noted plaintiff had a "very comprehensive medical workup" for the 6-year period, including one psychiatric evaluation.  Dr. Spann noted plaintiff "declined to continue seeing [the psychiatrist] . . . of her own accord."  Dr. Spann noted it was plaintiff's perception that she had not been, and would not be, "taken care of medically because she has a workers compensation claim."  Dr. Spann noted that based on a 16-page summary provided by plaintiff, it appeared plaintiff "had an

incident where she was raped"[1] which had a "prevailing overall influence on her mental condition." (Tr. 345). Noting an egregious comment by plaintiff's father who was present during the consultative examination, Dr. Spann noted there were "numerous overlapping psychological scenarios in this complex case evaluation." Dr. Spann noted that in examining plaintiff for her complaints of left hip pain, "there were multiple findings consistent with positive Waddell, including the theatrics, the distraction tests, the simulation tests." (Tr. 346). Dr. Spann noted plaintiff's tearful behavior at one point during the examination and reinforcement of such behavior by plaintiff's father and a female accompanying plaintiff. Dr. Spann noted inconsistencies and marked discrepancies throughout the physical examination. In his "Impression/Discussion," Dr. Spann found no pathology consistent with plaintiff's stated complaints and noted:

> I do, however, believe that she thinks she has a great physical problem, but most importantly, I believe she has a great deal of functional overlay or psychological problems that are tending to manifest in this situation. I could not recommend strongly enough that she seek psychiatric intervention, perhaps in conjunction with a pain management program. . . . I think overall there are far more troubling issues for her on a personal level that apparently go back many years, and until these psychological issues are dealt with she may not experience any subsequent perceived physical improvement until these are addressed.

(Tr. 346-47). Prior to the examination, Dr. Spann had clarified to plaintiff that he "would not be providing or recommending care" but, instead, would be acting "purely" as an "independent, objective examiner." (Tr. 344).

After plaintiff's March 31, 2000 DLI, medical records dated April 25, 2007 and July 25, 2007 noted plaintiff's possible panic attacks. (Tr. 1189; 1191). In June 2008, during

---

[1]Plaintiff denied any history of sexual abuse during a consultative psychological exam on December 17, 2008. (Tr. 1108).

examination at John Hopkins, plaintiff "expressed great reluctance to include a psychologist or psychiatrist in her care."  (Tr. 574).  On June 24, 2008, a physician's assessment noted plaintiff's "[h]istory of multiple somatic complaints."  (Tr. 1424).

On July 26, 2008, Dr. Friend noted plaintiff's "differential has to include a histrionic personality disorder," noting he suspect[ed] that there are some chronic psychological issues that have never been adequately addressed with her."  (Tr. 1467).  Dr. Friend was not sure if there was local expertise to "deal with her psychological problems or evaluate to determine if she has them or not," but noted that histrionic personality disorder should be evaluated.

On August 7, 2008, plaintiff filed an application seeking disability insurance benefits alleging she became unable to work because of a disabling condition on March 9, 1984.  (Tr. 210-12; 224-46).  In her application, plaintiff alleged her ability to work was limited due to the following conditions:  fibromyalgia, asthma, muscle and joint pain and stiffness, hip and back pain, chest pain, migraine headaches, chronic sore throat, sinus infections and bronchitis, chronic urinary tract infections, shortness of breath, chronic nausea, dizziness, fatigue and weakness, and a constant burning sensation in the arms and legs.  (Tr. 227-34; 235).  Plaintiff alleged the above *physical* impairments limit her ability to work in that she is severely limited in all exertional capacities, that fatigue due to pain affects her concentration, memory and understanding, and other tasks are affected by blurry vision.  (Tr. 236; 259-66).  Plaintiff did not allege any *mental* impairment and/or condition affected her ability to work.  Plaintiff indicated her physical impairments first interfered with her ability to work two years prior to her application, but also indicated she became unable to work because of her impairments on March 9, 1984.  (Tr. 236).  Plaintiff noted she completed college but was "still in school," and identified past work in

radio/TV, as a personnel specialist in the computer marketing industry, as an employment consultant for a governmental agency, and other short-term jobs.  (Tr. 237-38; 244; 247-52).  On August 26, 2008, plaintiff applied for benefits under the Supplemental Security Income (SSI) program.  (Tr. 217).

On December 17, 2008, plaintiff submitted to a consultative mental status examination. Dr. Schneider identified plaintiff's diagnoses as (1) Delusional Disorder, somatic type; (2) Major depressive disorder, recurrent, severe; and (3) Histrionic personality disorder, and assessed a GAF score of 40.[2]  Dr. Schneider found plaintiff had limited memory, judgement and insight, but her concentration was within normal limits.  (Tr. 1107-09).

On December 22, 2008, a Psychiatric Review Technique was completed assessing plaintiff's mental condition from June 1, 2008 to December 22, 2008.  The state agency physician identified plaintiff's diagnoses as (1) 12.04 Affective Disorders (MDD, recurrent, severe); and (2) 12.07 Somatoform Disorders (delusional d/o, somatic type).[3]  (Tr. 173; 1111; 1114).  The physician noted "moderate" limitations in restriction of activities of daily living, difficulties in maintaining social functioning, concentration, persistence or pace, with one or two episodes of decompensation, each of extended duration.  (Tr. 1122).  The physician noted plaintiff did not allege mental limitations as a disability but that the medical evidence of record "noted so much psych overlay that [a] mental [consultative exam was] ordered."  (Tr. 1123).

---

[2]A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) **OR** major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  *www.gafscore.com* (emphasis added)

[3]Plaintiff's somatoform disorder indicated physical symptoms for which there were no demonstrable organic findings or known physiological mechanisms, as evidenced by unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that she has a serious disease or injury.  Tr. 1117.

The physician noted several medical entries from 2006-2008 referencing such psychological overlay, as well as the 2008 consultative exam findings.  In his Mental Residual Functional Capacity Assessment, the physician found plaintiff was "markedly limited" in her ability to understand, remember or carry out detailed instructions, to complete a normal workday/workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, or get along with coworkers without distracting them or exhibiting behavioral extremes. (Tr. 1126-27).  The physician found plaintiff "moderately limited" in several other categories.  The physician concluded plaintiff was not able to complete a normal workweek without interruption from the symptoms of her mental disorder, nor was she unable to refrain from behavior extremes from somatic delusions.  (Tr. 1128).

On December 31, 2008, the Social Security Administration granted plaintiff's application for SSI, finding plaintiff disabled beginning August 26, 2008 due to a *mental* condition.  (Tr.  23; 27).  The Administration, however, denied plaintiff's application for disability benefits finding:

> You said you are disabled because of fibromyalgia, asthma, chest pain, shortness of breath, and depression.  The evidence we now have is not sufficient to support that your conditions were disabling prior to 03/31/00 when your period of coverage ended.

(Tr. 175-79).[4]  Plaintiff requested reconsideration arguing she "cannot hold down a job due to continual sickness with chronic infections; multiple brain tumors; autoimmune deficiency; repeated stress fractures; congestive heart failure; [and] pulmonary disease."  (Tr. 180).

On December 31, 2008, Dr. Baker, plaintiff's pulmonologist, noted under his assessment

---

[4]Nothing regarding the SSI application was appealed, therefore, the ALJ's decision addressed only whether plaintiff was under a disability prior to the expiration of her insured status on March 31, 2000.  (Tr. 23).

plaintiff's "panic disorder with agoraphobia and severe panic attacks" after plaintiff, prior to examination, detected a strange odor prior to examination and had a panic attack requiring a breathing treatment.  (Tr. 1175).

In a Reconsideration Disability Report, plaintiff alleged that as of September 2008, her physical impairments had worsened, and tumors were causing hormonal, vision and hearing problems.  Plaintiff also alleged an inability to add or subtract numbers, difficulty remembering doctor's orders, how to spell, or what words mean, and hand spasms limiting her writing to only a few words.  (Tr. 290).  On April 1, 2009, a Psychiatric Review Technique was completed assessing plaintiff's mental condition from March 9, 1989 to March 31, 2000.  The state agency physician identified plaintiff's diagnoses as (1) "disorders of back (discogenic and degenerative), and (2) 12.04 Affective Disorders ("functional overlay").  (Tr. 174; 1148).  The physician found the evidence was insufficient to find any functional limitations for the time period prior to plaintiff's DLI, noting only one entry from August 20, 1999 diagnosing functional overlay or psychological problems (Dr. Spann's consultative orthopedic exam).  (Tr. 1155; 1157).

On April 7, 2009, the Administration denied plaintiff disability benefits on reconsideration finding:

> You said you are disabled because of fibromyalgia, asthma, chest pain and shortness-of-breath.  The evidence we now have is not sufficient to support that your conditions were disabling prior to 03/31/00 when your period of coverage ended.

(Tr. 181-84).  In her request for a hearing in her case, plaintiff stated the denial of her claim was improper because "I have been ill in bed for 25 years."  (Tr. 185).

On March 24, 2010, plaintiff was provided notice of the administrative hearing.  The notice stated, among other things, that an Administrative Law Judge (ALJ) would be considering

whether plaintiff had enough earnings under Social Security to be insured for a Period of Disability and Disability Insurance Benefits. (Tr. 195). Enclosed with this notice was a copy of the letter the ALJ sent to the vocational expert called to testify at the hearing. (Tr. 197). Such letter stated that the expert's testimony would primarily cover the period "March 9, 1984 through March 31, 2000." (Tr. 202).

On April 20, 2010, an administrative hearing was held on the remaining part of plaintiff's claim for disability benefits. (Tr. 138-72). The administrative record contained numerous letters plaintiff submitted to her physicians as well as the Social Security Administration regarding her perceived illnesses, her distrust of the medical system, allegations of refusal of treatment, forgery of records, and collusion. (Tr. 134; 348).

Plaintiff appeared at the hearing without representation, explaining to the ALJ why she chose self-representation:

| | |
|---|---|
| ALJ: | Now, in your case, is there an attorney or representative to help you? |
| CLMT: | No, sir.  My witnesses are my family.[5] |
| ALJ: | Your – these are all your family? |
| CLMT: | Yes, sir.  I had attorneys for – in the past, and they represented the insurance companies and workers' comp, so – |
| ALJ: | Oh, okay.  Well, now – |
| CLMT: | – instead of me. |
| ALJ: | – you could – you could have one for this also. |
| CLMT: | I know that I can, and – |
| ALJ: | Now, it's whatever you want to do.  We can have the hearing |

---

[5]Plaintiff appeared with three (3) witnesses: her mother, father and brother.  (Tr. 140).

today, which is fine.  Either way is fine with me.  Or if you wanted
to obtain a representative, I would just give you a postponement.

CLMT:          Let's just go ahead and do it today.

The ALJ then noted he had all of plaintiff's records and inquired whether such records were to

be admitted into evidence.  Acknowledging the ALJ had medical records in addition to those in

her possession, plaintiff expressed "there were no relevant records that pertained to [her]

disability" in the records submitted because the records did not acknowledge her "dislocated hip,

the bone infection, the stage four congestive heart failure, [or] the pulmonary hypertension" but,

instead, "said [she] was delusional and had agoraphobia and a fear of crowds."  (Tr. 141-42).

Even so, it appears plaintiff submitted additional records to the ALJ (Tr. 143), and then the ALJ

identified the issues for the plaintiff:  (1) what her impairments are; (2) how they affect her; (3)

how long they have lasted; and (4) how long they can be expected to last.

At the hearing, plaintiff testified that although she "was sick all through childhood" she

"worked all through junior high and high school."  (Tr. 163; 165).  Plaintiff reported she became

very ill in 1974, after graduating high school in three years at the age of 17, when she began

experiencing muscle weakness in her legs and suspected she had multiple sclerosis (Tr. 164).

Plaintiff explained she then began attempting to "find out what was wrong with [her] and trying

to get medical care."  (Tr. 155).

Plaintiff received her college degree with a 3.8 GPA and went to work for IBM in Salt

Lake City, UT in computer marketing.  Plaintiff testified she began having "crushing chest pain"

in 1979 (Tr. 147), had recurrent bladder infections from 1979 until 1984 (Tr. 161), and a mass

throat infection in 1982 (Tr. 160).

Plaintiff testified she was transferred to Los Angeles in 1982,[6] and worked with IBM until she "collapsed" at work on March 9, 1984. (Tr. 146; 159). Plaintiff testified she was diagnosed that year by a Dr. Yu at UCLA with systemic lupus erythematosus.[7] (Tr. 144-45). Plaintiff testified she then moved back to Amarillo to live with her parents. (Tr. 155). Plaintiff testified the first physician she saw in Amarillo denied she had lupus and that she "laid in bed for two years, '84 and '85." (Tr. 146). Plaintiff testified that in 1985, she received an additional diagnosis of petit mal seizures as the cause of her passing out. (Tr. 147-48).

In 1986, plaintiff obtained employment as a personnel specialist with the Texas Employment Commission (TEC). Plaintiff testified that while employed in this capacity, she had difficulty standing, passed out every day, and used all of her vacation and sick time due to her illnesses. (Tr. 145). Plaintiff's employment with TEC ceased in February 1989.[8] (Tr. 257). Plaintiff testified that after 1989, she had "a lot of temporary jobs," and made "a lot of desperate attempts to work." (Tr. 146).[9] In 1997, a year with reported earnings of an amount presumptively considered substantial gainful activity, plaintiff testified she worked as a temp at the University of Texas at Austin in the Office of Accounting. Plaintiff stated she held other temporary jobs in 1998 and 1999. (Tr. 146-47).

Plaintiff testified she was able to obtain health insurance in January 2002, but "wasn't

---

[6]Plaintiff reported the smog and car fumes caused her to pass out and vomit daily on her way to work at IBM and that an allergy doctor told her she was "allergic to the chemicals in the air, and [] had three months to live, or get out of L.A." (Tr. 160, 161).

[7]A report from plaintiff's physician at UCLA, however, stated plaintiff's blood tests for ANA, rheumatoid factor, and ESR were negative, and x-rays of the joints were normal. (Tr. 2528 ).

[8]Plaintiff married in March 1989 and moved from her parents' Amarillo home to Nebraska. (Tr. 211; 1252). Plaintiff may have lived in Dallas during the summer and fall of 1993 and Austin from 1997-December 1999. (Tr. 1240; 1253).

[9]In 1990, plaintiff's reported earnings were $20,017.36, and in 1992, $12,633.08. (Tr. 25; 219).

allowed to get medical treatment," despite her claims of pneumonia, until March 2004 when a

chest x-ray revealed enlarged, fluid-filled lungs.  (Tr. 155-56).  Plaintiff advised that since that

time, she had "been in the ER an average of four to six times a month," and hospitalized over

twelve times per year.  (Tr. 156).  Plaintiff acknowledged she had not worked in the last ten (10)

years due to her physical condition.  (Tr. 146).  Plaintiff testified Texas doctors refused to

recognize her lupus diagnosis until March 2010, thus effectively denying her access to medical

care for "the last 27 years."  (Tr. 155).

        At the hearing, plaintiff described her daily symptoms as severe crushing chest pain,

shortness of breath, numbness in the face, feeling like passing out, passing out, black holes in her

vision, back pain, pain radiating down her left arm, and fatigue.  (Tr. 147-48).  Plaintiff further

described swelling and pain, particularly in her wrists, legs and hands.  (Tr. 150).  Plaintiff

testified she is limited to activities for 1-2 hours a day, every third day (Tr. 149-50), and advised

that on a good day, if she is rested, she can push a grocery cart for 20 minutes and buy groceries.

(Tr. 151).  Plaintiff appeared to claim disability due to congestive heart failure, pulmonary

hypertension, brain tumors, a dislocated hip, a bone infection, visual disturbances caused by a

"meningioma on the optic chiasm," migraine syndrome, immune dysfunction or lupus, and

unremitting pain.  Plaintiff did not claim disability due to a mental impairment. Plaintiff

acknowledged she did not have any records saying she was "sick" except for the 1984 record

from Dr. Yu at UCLA and records from 2004.  (Tr. 169; 171).  Plaintiff argued, however, that all

other doctors would refuse to run tests proving her illnesses and, instead, would simply "write

down that [she] was crazy."  (Tr. 169).  Plaintiff expressed a strong desire to work, noting that if

the ALJ could find a doctor who had "a cure for stage four congestive heart failure from heart

damage from untreated infection," she would be able to work. (Tr. 165). Plaintiff denied seeing any doctors or therapists for mental problems, but explained she had tried unsuccessfully to go through counselors and social workers to get access to medical care. (Tr. 154).

A vocational expert was present at the hearing but was not called by the ALJ to testify. The ALJ did not advise plaintiff that she could question the VE. After the hearing, plaintiff submitted several post-hearing letters in support of her claim for disability benefits. (Tr. 47-53; 54-83; 84-106; 107-137)

On May 19, 2010, the ALJ rendered an unfavorable decision, finding plaintiff not disabled and not under a disability as defined by the Social Security Act at any time from March 9, 1984, her alleged onset date, through March 31, 2000, the date plaintiff was last insured. (Tr. 20-42). The ALJ found plaintiff engaged in substantial gainful activity after her alleged onset date in the years 1986, 1987, 1988, 1989, 1990, 1992, and 1997.[10] (Tr. 25). Plaintiff otherwise did not engage in substantial gainful activity at any relevant time from her alleged onset date in March 1984 through the expiration of her insured status in March 2000. The ALJ determined plaintiff had the following "severe" combination of medical impairments prior to the expiration of her insured status: urethral stenosis and chronic urinary tract infections requiring cystoscopy and internal urethrotomy procedures, a history of mitral valve prolapse, injuries status-post a motor vehicle accident, minimal to mild degenerative changes of the lumbar spine, a history of temporomandibular joint dysfunction, cervical sprain, lumbar sprain, chronic pain, radicular syndrome of the left lower extremity, cephalgia [headaches], moderate obesity, left hip

---

[10]Plaintiff earned $8,958 in 1986, $18,228 in 1987, $18,392 in 1988, $11,973 in 1989, $20,017 in 1990, $12,633 in 1992, and $9,455 in 1997, amounts above the levels presumptively considered substantial gainful activity for those respective years. (Tr. 25; 218-19).

dysplasia, left hip osteoarthritic changes, possible left hip avascular necrosis, and fibromyalgia. (Tr. 26).  The ALJ noted plaintiff's chronic pain and fatigue prior to her DLI could have been due to her fibromyalgia and the combination of all of her impairments.

The ALJ separately discussed plaintiff's mental impairments, noting she was not diagnosed with delusional disorder-somatic type, major depression, and histrionic personality disorder until 2008.  (Tr. 26-28).  Noting an impairment must be "established by medical evidence," the ALJ found the medical evidence of record did not indicate plaintiff had a medically determinable mental impairment prior to her DLI, or that plaintiff was impaired in performing any basic mental work activities prior to her DLI.  (Tr. 26; 27).  Specifically, the ALJ found the medical record did not reflect plaintiff reported having significant depression or mental problems prior to her DLI, and noted the agency's physicians who reviewed plaintiff's case at the initial and reconsideration administrative levels had also found insufficient evidence to assess her mental condition or find a severe mental impairment prior to March 2000.  (Tr. 27). The ALJ also noted plaintiff's disagreement with the 2008 mental diagnoses and her attempt to have them corrected.

In noting there was support in the record for some of plaintiff's claims, the ALJ noted Dr. Spann's August 1999 worker's compensation examination, detailing the doctor's observations as to "overlapping psychological scenarios" in plaintiff's case and his opinion that plaintiff should seek psychiatric intervention in conjunction with pain management.  (Tr. 27-28).  The ALJ noted he considered Dr. Spann's report but agreed with plaintiff's statement that Dr. Spann was the only pre-DLI doctor who had opined plaintiff had mental problems.  (Tr. 28).  The ALJ also noted Dr. Spann may have misinterpreted certain statements by plaintiff or may have been

influenced by his perception of plaintiff's symptom magnification.  The ALJ also noted plaintiff

had made incredible, seemingly outlandish allegations to Dr. Spann as well as in various post-

DLI letters.  However, the ALJ concluded plaintiff did not have a medically determinable mental

impairment prior to her DLI, and that even if plaintiff had a pre-DLI mental impairment, there

was not evidence to indicate it caused any limitations to her ability to do basic mental work

activity.  The ALJ found it significant that whatever mental impairment plaintiff may have had

pre-DLI, it did not prevent her from working at a substantial gainful activity for seven (7) years

after her alleged onset date.  The ALJ also found that even if plaintiff had a mental impairment

prior to her DLI, he found no mental limitations under the "B" criteria of the listings, or any

medically documented evidence of her mental condition meeting any of the "C" criteria.

Consequently, the ALJ did not find any "severe" mental impairments prior to the expiration of

plaintiff's insured status.  (Tr. 26).

     The ALJ found the objective medical evidence failed to establish plaintiff's impairments

prior to her DLI, either individually or in combination, met or equaled any listed impairment, as

the evidence failed to establish the required severity.  (Tr. 29).  The ALJ noted he considered the

opinions of the State agency medical consultants who evaluated the issue at the initial and

reconsideration levels of the administrative review process and had reached the same conclusion.

     The ALJ further found that through her March 31, 2000 DLI, plaintiff retained the

residual functional capacity (RFC) – the most an individual can still do after considering the

effects of physical and/or mental limitations that affect the ability to perform work-related tasks

– to perform the full range of sedentary work.  (Tr. 29).  The ALJ found plaintiff could work

full-time at this RFC on a sustained basis and maintain employment for an indefinite period of

time. In making this determination, the ALJ considered all symptoms and opinion evidence.  The ALJ detailed plaintiff's testimony, as well as 2010 letters from plaintiff and her mother.  (Tr. 29-31).  The ALJ found such testimony, allegations and statements concerning the extent of plaintiff's pain and functional limitations were only partially supported by the evidence because they were somewhat inconsistent and not reasonably supported by the objective medical evidence and other evidence.  (Tr. 31; 32).  The ALJ also detailed the voluminous pre- and post-DLI medical evidence of record finding there was no indication plaintiff's physical problems existed at a sufficient level of severity to preclude her from working prior to her DLI.  (Tr. 32-41).  The ALJ noted plaintiff "may have experienced some degree of pain or discomfort at times of overexertion" prior to her DLI, but that "even a moderate level of pain is not, standing alone, incompatible with the performance of certain levels of sustained work activity."  (Tr. 41).  The ALJ found that "neither the objective medical evidence or any reasonable inference therefrom, nor any other non-medical evidence, establish[ed] that [plaintiff's] ability to function was so severely impaired as to preclude the performance of the full range of sedentary work prior to the expiration of her insured status."  (Tr. 41).  The ALJ concluded the medical evidence did not support disability prior to plaintiff's DLI.

Based upon his RFC finding, the ALJ found that prior to the expiration of her insured status, plaintiff was able to perform her past relevant work as an employment consultant at the Texas Employment Commission as she performed it.  (Tr. 41-42).  Accordingly, the ALJ determined plaintiff was not under a disability, as defined by the Act, at any time from March 9, 1984, her alleged onset date, through March 31, 2000, her date last insured (Tr. 42). The ALJ also attached a List of Exhibits identifying various documents and/or records he relied upon in

making his decision.  (Tr. 43-46).

On September 30, 2010, plaintiff requested review of the ALJ's decision, noting she did not have a representative because "no one will take my case because of the political problem in Texas – Texas dr's left me to get congestive heart failure & lung disease from untreated infection x 20 years."  (Tr. 18-19).

On November 21, 2011, the Appeals Council's denied plaintiff's request for review.  (Tr. 15-17).  Plaintiff submitted post-determination letters arguing she should be awarded disability benefits, together with new medical records.  (Tr. 7-12; 13-14).  The Administration construed such as a request for an extension of "time to file a civil action (ask for court review)" and granted an extension.  (Tr. 5-6).

On April 12, 2012, plaintiff retained counsel to represent her in connection with her claims for disability benefits and SSI.  (Tr. 4).  On April 19, 2012, plaintiff, represented by counsel, requested review of the ALJ's decision.  (Tr. 3).  The Administration again construed such as a request for an extension of "time to file a civil action (ask for court review)" and granted an extension.  (Tr. 1-2).

On June 7, 2012, plaintiff filed a complaint, *pro se*, seeking judicial review of the denial of benefits pursuant to 42 U.S.C. § 405(g).  On November 19, 2012, the Commissioner filed an answer to plaintiff's complaint, together with the administrative record in this case.  On December 17, 2012, counsel made an appearance on plaintiff's behalf, subsequently filing a brief on February 20, 2013.

III.

ISSUES

Plaintiff raises three (3) grounds for reversal of the Commissioner's decision denying

benefits:

1.    The ALJ's finding that plaintiff did not have a medically determinable
      *mental* impairment prior to her date last insured was not supported by
      substantial evidence;

2.    The ALJ erred in his advice to plaintiff regarding her right to
      representation and in failing to advise her of the issues involved in the
      hearing, particularly the significance of her date last insured; and

3.    The ALJ erred in failing to employ proper legal standards by not
      considering the combined effects of plaintiff's impairments before the date
      last insured.

IV.

MERITS

In reviewing disability determinations by the Commissioner, this Court's role is limited

to determining whether substantial evidence exists in the record, considered as a whole, to

support the Commissioner's factual findings and whether any errors of law were made.

*Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989).  To determine whether substantial

evidence of disability exists, four elements of proof must be weighed: (1) objective medical

facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective

evidence of pain and disability; and (4) claimant's age, education, and work history.  *Wren v.*

*Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94(5th

Cir. 1972)).  If the Commissioner's findings are supported by substantial evidence, they are

conclusive, and the reviewing court may not substitute its own judgment for that of the

Commissioner, even if the court determines the evidence preponderates toward a different

finding. *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980).  Conflicts in the evidence are

to be resolved by the Commissioner, not the courts, *Laffoon v. Califano*, 558 F.2d 253, 254 (5th

Cir. 1977), and only a "conspicuous absence of credible choices" or "no contrary medical

evidence" will produce a finding of no substantial evidence.  *Hames v. Heckler*, 707 F.2d at 164.

Stated differently, the level of review is not *de novo*.  The fact that the ALJ <u>could</u> have found

plaintiff to be disabled is not the issue.  The ALJ did not do this, and the case comes to federal

court with the issue being limited to whether there was substantial evidence to support the ALJ

decision and whether any errors of law were made.

### A. *Evidence of Mental Impairment Prior to DLI*

In her first ground of error, plaintiff argues "[t]he ALJ's finding that [she] did not have a

medically determinable *mental* impairment prior to her date last insured was not supported by

substantial evidence."  (emphasis added).  Specifically, plaintiff appears to argue her mental

conditions existed, were severe, and had an effect on her functioning, prior to her DLI.[11]

As noted above, the ALJ determined, at Step 2, that although the record reflected

plaintiff's diagnoses of mental impairments in 2008, "the evidence [did] not indicate [plaintiff]

had a medically determinable mental impairment[12] prior to the expiration of her insured status"

on March 31, 2000, or that "she had a mental impairment or combination of mental impairments

that was 'severe' . . . prior to the expiration of her insured status."  (Tr. 26).  Specifically, the

ALJ found the medical record did not indicate plaintiff reported having significant depression or

---

[11]Plaintiff does not contest the ALJ's findings as to any *physical* impairment.

[12]"Medically determinable" means a person's physical or mental impairment or combination of impairments must result from anatomical, physiological or psychological abnormalities that can be shown by medically acceptable clinical and laboratory techniques.  It must be 'established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms.'" (Tr. 26) (citing 20 C.F.R. §§ 404.1508, 404.1528).

mental problems prior to her DLI, noting the Administration's similar finding that there simply

was insufficient medical evidence of record to assess any mental impairment prior to plaintiff's

DLI.  (Tr. 27).  Noting he considered the only pre-DLI medical evidence of a mental impairment

found in Dr. Spann's consultative orthopedic evaluation, the ALJ noted the doctor's possible

misinterpretation of what plaintiff was reporting to him concerning past traumatic experiences

and that his opinion may have been influenced by his perception of plaintiff's symptom

magnification.  (Tr. 28).  Although concluding the evidence did not establish a medically

determinable mental impairment prior to plaintiff's DLI, the ALJ found that even if plaintiff did

have a pre-DLI mental impairment,  the evidence did not indicate it caused any limitations to her

ability to do basic mental work activity, finding the years of SGA to be significant evidence of

such.  The ALJ also found that even if plaintiff had a mental impairment prior to her DLI, that

she did not meet the mental limitation levels under the statutory criteria.

To be entitled to disability benefits, a claimant must show her period of disability began

on or prior to the expiration of her insured status – here, March 31, 2000.  A claimant who

becomes disabled <u>after</u> the expiration of her insured status is not entitled to disability benefits.

*See Oldham v. Schweiker*, 660 F.2d 1078, 1080 (5th Cir. 1981).  Moreover, the claimant has the

burden of showing a medically "severe" impairment.  *See Anthony v. Sullivan*, 954 F.2d 289, 293

(5th Cir. 1992).

Plaintiff contends that contrary to the ALJ's finding that the evidence of record did not

demonstrate a medically determinable mental impairment pre-DLI, there was, in fact, evidence

in the record that she had a severe mental impairment prior to her DLI that limited her ability to

do basic work activities.  Specifically, plaintiff points to letters she had written exposing a likely

mental illness prior to her DLI; her post-DLI diagnosis of a histrionic personality disorder which,

by definition, typically begins in early childhood; the severity of her subsequent diagnoses evidencing her mental impairments necessarily existed pre-DLI and progressed to the post-DLI severity level; plaintiff's testimony at the hearing relating to time periods prior to her DLI; the comments by Dr. Spann in his 1999 orthopedic evaluation regarding plaintiff's workers' compensation claim as to a likely psychological component of plaintiff's physiological complaints; and the ALJ's own observations of outlandish allegations, symptom magnification or exaggeration.

The Court finds the ALJ's determination that the evidence of record did not reflect plaintiff had a medically determinable mental impairment prior to her DLI is supported by substantial evidence.  The ALJ carefully considered the entire voluminous record, ultimately finding the medical evidence did not establish a pre-DLI mental impairment.  The ALJ thoroughly discussed plaintiff's mental impairments, pre- and post-DLI, even though plaintiff did not ever allege a mental impairment contributing to her inability to work.[13]  While plaintiff's failure to allege a mental impairment and/or her denial of mental impairments does not necessarily preclude a finding of mental impairments, there still must be some objective medical evidence establishing such impairments.  The ALJ correctly observed the objective medical facts as to any mental impairment were made *after* the expiration of plaintiff's insured status on March 31, 2000.  There were no objective medical facts or opinions from treating or examining physicians indicating plaintiff's mental impairments were severe, or that plaintiff was disabled by such mental impairments, prior to March 31, 2000.  In fact, during the relevant time period, no doctor ever diagnosed plaintiff with a mental impairment, ever treated plaintiff for a mental

---

[13]Plaintiff has not individually acknowledged any mental impairment, instead arguing she is disabled by physical impairments which have been exacerbated due to a conspiracy among the doctors, hospitals and other health care workers she has seen.

impairment, ever placed any restrictions on plaintiff's ability to work due to a mental impairment, or ever indicated plaintiff was unable to work due to a mental impairment.  Dr. Spann's observations, made during an orthopedic consultation only six months prior to plaintiff's DLI, that he suspected psychological issues were affecting plaintiff's perceived, but pathologically unsupported, claims of physical pain did not constitute sufficient medical evidence to establish the existence of a severe pre-DLI mental impairment affecting plaintiff's ability to work to the degree that would cause the ALJ findings to be erroneous.  Dr. Spann is not a mental health provider and while he certainly suspected mental issues to be present, he did not make any specific diagnosis of a mental impairment that would resolve this issue in plaintiff's favor.  This is particularly so since the ALJ did not have a "detailed description" of the purported mental impairment upon which he could base a favorable determination.  Plaintiff's other alleged "evidence" does not amount to "medically acceptable clinical and laboratory techniques" definitively showing the existence of a severe mental impairment prior to plaintiff's DLI, nor is it sufficient medical evidence of record establishing plaintiff had a severe mental impairment limiting plaintiff's ability to do basic mental work activity.  Moreover, plaintiff's work history reflected plaintiff worked full-time jobs after her 1984 alleged disability onset date, and worked sporadically at part-time jobs until at least 1997, just before her DLI.  There is nothing in the record indicating plaintiff ever had to leave a job prior to her DLI as a result of mental problems, nor it there any indication plaintiff's mental impairments limited her mental ability to do basic work activities while insured.

The lack of objective evidence of plaintiff's pre-DLI mental impairment or the severity thereof (how any such mental impairment limited her ability to do basic work activities) supports the ALJ's determination.  The ALJ's determination that there was a lack of evidence to support a

finding of a pre-DLI severe mental impairment is supported by substantial evidence.

Even if the lack of objective medical evidence of a mental impairment could arguably be due to plaintiff's refusal to acknowledge she might suffer from mental impairments, the fact remains that it was plaintiff's burden to present evidence to support her claim that she was disabled by a mental impairment prior to March 31, 2000. *See Yuckert*, 482 U.S. at 146 n.5, 107 S.Ct. at 2294. While it is certainly possible plaintiff was "in denial" as to mental issues, her failure to independently acknowledge and seek out treatment and/or evaluation for a mental impairment results in insufficient objective medical evidence regarding plaintiff's mental condition from the alleged onset date of March 9, 1984 to the date she was last insured on March 31, 2000. Plaintiff did not meet her burden of showing her mental impairment was "severe" prior to her DLI. Considered as a whole, there is substantial evidence to support the ALJ's finding that the evidence of record did not indicate plaintiff had a medically determinable mental impairment prior to her DLI or that plaintiff had a mental impairment or combination of mental impairments that was severe prior to her DLI. Plaintiff's claim should be DENIED.

As an additional component of his first ground, plaintiff argues the ALJ made an error of law by failing to comply with SSR 83-20 which states the policy and describes the evidence to be considered "when establishing the onset date of disability." Plaintiff argues the same "evidence" she contends demonstrated a severe mental impairment prior to her DLI (see above), gave the ALJ cause to infer plaintiff's mental impairments had an onset date prior to the 2008 diagnoses and prior to plaintiff's March 2000 DLI and, therefore, SSR 83-20 imposed an obligation on the ALJ to go beyond the record, *i.e.*, imposed upon the ALJ a duty to call a medical expert, or inquire of plaintiff, other witnesses and other sources, to determine the onset

of plaintiff's mental impairment.  Plaintiff appears to argue the ALJ's failure to call, at the ALJ

hearing in 2010, a medical expert or others for evidence of plaintiff's mental functioning prior to

March 31, 2000 was reversible error.

The Court notes SSR 83-20 is implicated when a decisionmaker has determined an

individual is, in fact, disabled and must then establish the onset date of disability – the first day

an individual is disabled.  SSR 83-20 sets forth the evidence to be considered when establishing

this post-disability determination onset date and when inferences are needed to determine a

precise date.  The ALJ, however, did not find plaintiff was disabled by a mental impairment prior

to her DLI, consequently, SSR 83-20 was not implicated.  Assuming *arguendo* that SSR 83-20

was applicable, the ALJ fulfilled his obligations by considering relevant evidence such as

plaintiff's allegations, work history and the medical and non-medical evidence, in determining

the record did not establish, at Step Two, that plaintiff's mental impairments were severe prior to

her DLI.  Moreover, since it was not necessary to infer an onset date of disability, the ALJ had

no obligation to consult a medical advisor or explore other sources of documentation.  The

undersigned finds the ALJ did not commit an error of law pertaining to SSR 83-20.  This claim

under plaintiff's first ground should be DENIED.

### B.  *ALJ's Misadvice and Failure to Advise*

On September 25, 2009, the Social Security Administration provided plaintiff with

correspondence noting her request for a hearing had been received and explaining the hearing

process.  (Tr. 186-87).  The correspondence specifically addressed plaintiff's right to counsel:

**Your Right to Representation**
You may choose to be represented by a lawyer or other person.  A representative
can help you get evidence, prepare for the hearing, and present your case at the

hearing.  If you decide to have a representative, you should find one immediately so that he or she can start preparing your case.

Some private lawyers charge a fee only if you receive benefits.  Some organizations may be able to represent you free of charge.  Your representative may not charge or receive any fee unless we approve it. We are enclosing a list of groups that can help you find a representative.

. . .

(Tr. 186).  Attached to this correspondence was a 2-page publication concerning a claimant's right to representation (Tr. 188-89), as well as a 2-page notice regarding obtaining a private attorney and a claimant's inability to pay for legal representation, and listing legal service groups providing free representation throughout Texas.  (Tr. 190-92).  Prior notices provided to plaintiff also advised her of her right to legal representation:  (1) Notice of Disapproved Claim, December 31, 2008; (2) Disability Reconsideration Notice, April 7, 2009; and (3) Request for Hearing by an ALJ, September 14, 2009.  (Tr. 175-78; 181-83; 185).  In a Notice of Hearing dated March 24, 2010, the ALJ also referenced the role of the representative at the hearing with the 2-page detailed publication concerning a claimant's right to representation.  (Tr. 193-200).

Despite these notices and explanations of a claimant's right to counsel, plaintiff appeared at the hearing without representation.  As set forth in Section II. above, plaintiff advised the ALJ that she chose self-representation because of experiences she had with attorneys in the past and her belief that they represented the interests of others rather than her own.  When the ALJ reminded plaintiff she could have an attorney for the hearing and that the ALJ would postpone the hearing for her to obtain representation, plaintiff confirmed that she was aware of her right but that she would like to proceed with the hearing that day.

In her second ground, plaintiff initially contends the ALJ "erred in his advice" to her

"regarding her right to representation" at the hearing.  This claim will be addressed as a contention that the ALJ failed to properly advise plaintiff of the importance of obtaining counsel.

Plaintiff chose not to obtain counsel at any point in the initial application process for benefits yet was ultimately awarded SSI benefits.[14]  After her request for a hearing challenging the denial of disability benefits, plaintiff was provided numerous notices and explanations of her right to counsel, including a list of sources for legal representation.  There is no indication plaintiff, who is a college graduate, did not understand the information provided.  At the hearing, the ALJ confirmed plaintiff was aware of her right to representation.  Plaintiff stated she was aware of her right and advised the ALJ that her decision to represent herself was based on prior experiences with attorneys.  When presented with the option of being given additional time to obtain representation, plaintiff declined and asked for the hearing to be held.  Plaintiff's statement is unambiguous.  There is no indication plaintiff's mental impairment, or anything else, was a relevant factor in her decision to represent herself or rendered her incapable of making an informed choice about representation.

The Court finds plaintiff was sufficiently informed, in writing, of, *inter alia,* her right to counsel, the possibility of free counsel, fee structures, and the limitation of fees.  Additionally, the ALJ again advised plaintiff of her right to representation and offered to postpone the hearing in order for her to obtain representation.  Plaintiff knowingly and voluntarily waived that right and elected to proceed with the hearing without representation, even stating her reason for doing so.  The undersigned finds no error by the ALJ.  This claim should be denied.

As a second issue under this ground, plaintiff argues the ALJ erred "in failing to advise her of the issues involved in the hearing, particularly, the significance of her date last insured."

---

[14]It is unclear whether plaintiff obtained representation with regard to her prior applications.

It is not clear whether plaintiff's argument is based upon an allegation that the ALJ failed to develop the record fully or failed to meet some other duty.  Regardless, plaintiff alleges the ALJ committed the following errors:

1.      When plaintiff advised the ALJ the records she possessed only went through March 2009 rather than March 2010 like the records received by the ALJ, the ALJ failed to "explain the significance of admitting such records into evidence."  Plaintiff contends she was not able to make an informed decision about whether the additional evidence should be admitted.

2.      The ALJ did not explain that an important part of the hearing would be to determine whether her disabilities were present from her alleged onset date of March 9, 1984 to her last insured date of March 31, 2000.

3.      The record received by the ALJ prior to the hearing indicated plaintiff suffered from mental illness and should have alerted the ALJ of the need for further explanation of the proceedings and that counsel was necessary for plaintiff's understanding.

4.      The ALJ did not notify plaintiff of her right to question the VE who was present at the hearing.

Plaintiff concludes the ALJ's failure to properly advise her of the nature of the proceedings renders his finding that the evidence does not indicate a medically determinable mental limitation prior to plaintiff's DLI, or a mental impairment or combination of mental impairments that was "severe" prior to plaintiff's DLI, unsupported by substantial evidence.

When a claimant is not represented by counsel, the ALJ has a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts," and that such is necessary to fulfill his duty to adequately develop the record.  *See Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984).  It is unclear, however, how this "special duty" imposed on the ALJ to develop the record requires the ALJ to further advise the claimant of all aspects of her case or to act as the claimant's advocate.  Moreover, even if an ALJ is guilty of failing to

develop the record, the claimant must show prejudice in the form of evidence that would have altered the outcome.  *Id*. at 1219-20.

As detailed under section II., the ALJ noted he had plaintiff's medical records through March 2010 (rather than only through March 2009) and inquired whether they were all to be admitted into evidence.  Plaintiff agreed and now claims error on the part of the ALJ for failing to advise her of the significance of the additional records.  Plaintiff fails, however, to identify which additional records, what the significance of these additional records was, or how the admission of such records prejudiced her.  At the conclusion of the hearing, after noting the ALJ had medical records in addition to those in her possession, plaintiff expressed "there were no relevant records that pertained to [her] disability" in the records submitted because the records did not acknowledge her "dislocated hip, the bone infection, the stage four congestive heart failure, [or] the pulmonary hypertension" but, instead, "said [she] was delusional and had agoraphobia and a fear of crowds."  (Tr. 141-42).  The Court finds no error, much less reversible error, on the part of the ALJ for failing to "explain the significance of admitting such records into evidence."

During the hearing, the ALJ identified the issues for the plaintiff:  (1) what her impairments are; (2) how they affect her; (3) how long they have lasted; and (4) how long they can be expected to last.  The ALJ did not specifically advise plaintiff that "an important part of the hearing would be to determine whether her disabilities were present from her onset to her date last insured."  This application for DI benefits, however, was not plaintiff's first attempt to obtain DI benefits.  Multiple documents reflected plaintiff's last date insured was March 31, 2000.  Moreover, on March 24, 2010, plaintiff was provided notice of the administrative hearing. The notice stated, among other things, that an Administrative Law Judge (ALJ) would be

considering whether plaintiff had enough earnings under Social Security to be insured for a Period of Disability and Disability Insurance Benefits.  (Tr. 195).  Enclosed with this notice was a copy of a letter the ALJ sent to the vocational expert called to testify at the hearing.  (Tr. 197).  Such letter stated that the expert's testimony would primarily cover the period "March 9, 1984 through March 31, 2000."  (Tr. 202).  Plaintiff has not demonstrated she suffered any prejudice due to any failure on the part of the ALJ to further emphasize the significance of plaintiff's DLI.  The undersigned finds no error, much less reversible error, on the part of the ALJ for failing to "explain to the pro se claimant an important part of the hearing would be to determine whether her disabilities were present from her onset to her date last insured."

Plaintiff also complains the ALJ, based on the record he had received, was aware, at the time of the hearing, that plaintiff suffered from mental illness and that the ALJ should have further explained the nature of the proceedings and the benefit of obtaining counsel to ensure plaintiff understood the proceedings.  Plaintiff has not argued she did not understand the nature of the proceedings.  Although, at the time of the hearing, plaintiff suffered certain mental disorders with regard to her medical condition, as well as depression, there is no evidence of any intellectual deficit.  Mental illness does not equal incompetence.  Plaintiff is an educated individual and, as found by the ALJ, was disabled as of August 2008.  She has not ever been found to be incompetent.  Plaintiff has not demonstrated any prejudice due to any failure on the part of the ALJ to take additional measures at the hearing.  The undersigned finds no reversible error on the part of the ALJ for failing to further explain to plaintiff the nature of the proceedings or the benefit of counsel.

The ALJ had requested a VE appear and give testimony at plaintiff's hearing.  (Tr. 202).  The VE was present at the hearing, but was not called to testify.  The ALJ did not notify plaintiff of her right to question the VE.  Without citation to authority, plaintiff claims this was reversible

error.

Plaintiff has not indicated she would have questioned the VE if advised that she could do so, has not stated what questions she would have asked, or how any such questioning would have altered the determination that plaintiff was not under a disability at any time prior to her DLI. Plaintiff has not demonstrated any prejudice.  The undersigned finds no error, much less reversible error, on the part of the ALJ for failing to "notify [plaintiff] of her right to question the vocational expert who was present at the hearing."

Plaintiff was provided a meaningful hearing and the opportunity to provide the necessary documentation of disability for the relevant time period.  Plaintiff's second ground of error is without merit and should be DENIED.

## C. *Misapplication of Legal Standards in Considering Combined Effects of Impairments*

In her third ground of error, plaintiff contends the ALJ reversibly erred by "failing to employ proper legal standards" in determining plaintiff was not disabled prior to her DLI. Plaintiff notes case law requires an ALJ to analyze the disabling effect of each of her ailments, as well as the combined effect of all of her impairments.  Plaintiff contends the ALJ failed to evaluate the combined effect of plaintiff's pre-DLI impairments as evidenced by the language of his decision.  Plaintiff points out that although the ALJ found a "'severe' combination of impairments," his analysis mentioned only that plaintiff tested negatively for lupus prior to her DLI, and contained a separate analysis of her mental problems.  Plaintiff appears to argue the ALJ's addressing her physical and mental impairments individually in his decision is evidence the ALJ did not consider the "combined effect" of the symptoms of all of her severe and non-severe impairments.  Plaintiff concludes the ALJ's determination that "neither claimant's

physical problems, nor mental problems would prevent her from working before the date last insured" demonstrates the ALJ did not consider the combined effect of plaintiff's impairments "before the date last insured."

Again, the ALJ found the record did not contain evidence reflecting a medically determinable mental impairment prior to plaintiff's DLI or a severe mental impairment or combination of impairments prior to plaintiff's DLI.  This finding was based on a lack of evidence of a mental impairment for the relevant time period.  Consequently, this is not a case where evidence of a pre-DLI mental impairment existed, and the ALJ failed to analyze the combined effect of such medically determinable mental impairment with plaintiff's physical impairments.  Here, the existence of a mental impairment prior to plaintiff's DLI was never established by the evidence of record.

Moreover, from a thorough review of the ALJ's decision, the undersigned finds the ALJ evaluated all of plaintiff's impairments established by the record for the relevant time period, and specifically considered the combined effect of these impairments.  (Tr. 24, 26-28).  The undersigned does not find the ALJ erred.  Plaintiff's third ground of error is without merit .

V.
CONCLUSION

Plaintiff was awarded SSI benefits in 2008 based upon a disability due to mental impairments.  Determining the exact date those mental impairments became disabling is not an exact science.  Mental illness is not like a physical injury, such as a broken leg, where the exact date it occurred can usually be determined to a reasonable medical certainty.  While there may be some evidence to support a belief that plaintiff may have had some mental issues in 1999 or earlier, there simply is no medical evidence establishing a mental impairment prior to March

2000.  Consequently, there is substantial evidence to support the ALJ's determination that plaintiff was not disabled and not under a disability as defined by the Social Security Act at any time from March 9, 1984, her alleged onset date, through March 31, 2000, the date plaintiff was last insured.

## VI.
## RECOMMENDATION

It is the opinion and recommendation of the undersigned United States Magistrate Judge to the United States District Judge that the decision of the defendant Commissioner finding plaintiff RAMONA GAYLE WILSON not disabled and not entitled to a period of benefits be AFFIRMED.

## VII.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this 6th day of September 2013.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or

transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).